UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| CLEAN ENERGY,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>APPLIED LNG TECHNOLOGIES,<br>USA, LLC., et al.,<br><br>　　　　Defendants. | SA CV 08-746 AHS (RNBx)<br><br>FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW IN SUPPORT<br>OF ORDER DENYING PLAINTIFF'S<br>MOTION FOR PRELIMINARY<br>INJUNCTION; ORDER DENYING<br>PLAINTIFF'S MOTION FOR<br>PRELIMINARY INJUNCTION |

**I.**

**PROCEDURAL BACKGROUND**

The above motion for preliminary injunction (the "Motion") was heard on August 4, 2008, and the Court, having considered the papers in support of the Motion filed by Plaintiff Clean Energy ("Plaintiff" or "Clean Energy"), the declarations and exhibits submitted therewith and the reply papers, the opposition papers submitted by Applied LNG Technologies USA, LLC ("Defendant" or "ALT"), and the declarations, exhibits, and objections submitted therewith, and all pleadings on file in connection with this motion, the Court makes the following

findings of fact and conclusions of law.

## II.

## FINDINGS OF FACT

**A.      Contractual Relationship**

1.      Clean Energy and ALT are competitors in the business of producing and distributing Liquefied Methane/Natural Gas ("LMG").  Declaration of Mitchell W. Pratt ("Pratt Decl."), ¶ 2; Declaration of Kevin Markey ("Markey Decl."), ¶ 4; and Defendant's Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Preliminary Injunction ("Defendant's Memorandum"), p. 2, ll. 20-2.

2.      LMG is used principally by municipalities to power their fleets of buses and other vehicles that run on natural gas. Pratt Decl., ¶ 2; Markey Decl., ¶ 4.

3.      Clean Energy "manufactures some of its own LMG, but purchases the majority of its LMG from other third-party producers."  Plaintiff's Memorandum of Points and Authorities in Support of its Motion for Preliminary Injunction ("Plaintiff's Memorandum"), p. 4, ll, 19-20.

4.      Clean Energy manufactures LMG at its own liquefaction plant in Houston, Texas.  That plant, known as the Pickens Plant, is capable of producing up to 35 million gallons of LMG per year (95,000 gallons per day).  Clean Energy's Form S-3 Registration Statement filed July 11, 2008 (Exhibit A, p. 10 to Defendant's Request for Judicial Notice).

5.      Clean Energy is in the process of building another liquefaction plant in California.  Counsel for Clean Energy represented at the hearing held on August 4, 2008, that the new

1  plant is located approximately one hundred (100) miles from Los
2  Angeles.  The plant, which is expected to be operational in the
3  fall of 2008, initially will be capable of producing up to 60
4  million gallons of LMG per year (164,000 gallons per day), and
5  will be expandable to 90 million gallons (246,000 gallons per
6  day).  Clean Energy's Form S-3 Registration Statement filed July
7  11, 2008 (Exhibit A, p. 10 to Defendant's Request for Judicial
8  Notice).
9         6.    By agreement effective as of May 15, 2007, Clean
10 Energy contracted with ALT for ALT to provide LMG to Clean
11 Energy.  Markey Decl., ¶ 5 and Exhibit A thereto.
12        7.    A second agreement, effective January 1, 2008, is
13 substantially identical to the first.  Pratt Decl., Exhibit A
14 thereto ("Agreement").
15        8.    Clean Energy characterizes the Agreement as a
16 "take-or-pay" contract.  Clean Energy's 10-K (Exhibit D, p. 139
17 to Defendant's Request for Judicial Notice).
18        9.    Under the agreements, ALT was to supply and Clean
19 Energy was to purchase 20,000 gallons per day of LMG on weekdays
20 and Saturdays.  Agreement § 3.1.  The point of delivery for all
21 LMG was ALT's plant located in Topock, Arizona.  Agreement,
22 Article IV, § 4.4 and Article VI, § 6.1.  The LMG is delivered
23 into trailers that each hold 10,000 gallons per trailer.  Markey
24 Decl., ¶ 5; Clean Energy's 10-K (Exhibit D, p. 61 to Defendant's
25 Request for Judicial Notice).
26        10.   The price of LMG under the agreements was not
27 fixed.  Rather, it fluctuates based on published "Prices of Spot
28 Gas Delivered to Pipelines."  Agreement, p. 37 (attachment

3

1  "Exhibit A" to Agreement).

2    11. The agreements provide for the sale and delivery of LMG "As Available FOB Topock Plant" and anticipates supply disruptions due to "non-scheduled plant shut down or production problems."  Agreement, Article I(d), Article III, § 3.1 and Article IV, § 4.5, pp. 25-26.

  12. Under the agreements, Clean Energy was to schedule the "pick up" of LMG on a weekly basis.

> By the Close of Business each Thursday,
> Buyer [Clean Energy] will provide Seller
> [ALT] with a pick up schedule . . . for
> each day of the following week.

Agreement, Article VI, § 6.2, p. 27.

  13. The agreements required ALT to render via e-mail an invoice to Clean Energy for each load of LMG delivered. Agreement, Article VII, § 7.1, p. 28.  Payment for LMG was due "[w]ithin twenty (20) days of receipt of an invoice."  Agreement, Article VII, § 7.2, p. 28.

  14. The agreements expressly condition a party's obligation to perform on the other party's full performance of all of its obligations.

> 15.8 <u>Full Performance Required</u>.
> Performance of any duty imposed on
> either party by this Agreement is
> conditioned on the other party's full
> performance of all duties imposed on it
> in this Agreement.

Agreement, Article XV, § 15.8, p. 34.

15. Under the agreements, Clean Energy and ALT contracted to exclude liability for consequential and incidental damages resulting from a breach:

> 11.3 <u>No Liability for Consequential Damages</u>. Neither party shall be liable to the other for special, incidental, punitive indirect or consequential damages, under any circumstances, including without limitation, consequential damages caused or arising out of, in whole or in part, any negligent act or omission or related strict liability.

Agreement, Article XI, § 11.3, p 31.

16. The agreements may be amended and any waiver by either or both parties of the time for performing any act under the Agreement shall not constitute a waiver of the time for performing any other act or an identical act required to be performed at a later time. Agreement, Article XV, §§ 15.1, 15.14, pp. 33, 35.

17. The agreements are to be interpreted in accordance with the laws of the State of Texas. Agreement, Article XV, § 15.2, p. 33. The provisions of the agreements are not to be construed "for or against any party based upon any attribution to such party as the source of the language in question." Agreement, Article XV, §15.10, p. 34.

//
//

**B.     Course of Dealings between the Parties during Contractual Relationship**

18. It is undisputed that the parties' course of dealings deviated from the terms of their agreements. Plaintiff's Reply Memorandum of Points and Authorities in Support of its Motion for Preliminary Injunction ("Plaintiff's Reply Memorandum."), p. 4.

19. Clean Energy never provided a weekly schedule of pick ups. Declaration of Christa Peila ("Peila Decl."), ¶¶ 11-12 (the citation is to the paragraph numbers as they appear in the Peila Decl.; the numbering, however, is erroneous). At most, it provided 24 hours advance notice. Powers Decl., ¶ 3.

20. A spreadsheet of all of the loads delivered since the inception of the parties' agreements indicates that there were many days on which Clean Energy did not take delivery of two loads of LMG (i.e., 20,000 gallons). On some days, it received no loads, and on others, it received a single delivery. Likewise, there were days when it received three or even four loads. Markey Decl., Exhibit B.

21. No documents or records of Clean Energy contradict ALT's spreadsheet.

22. Clean Energy generally did not pay for LMG within the twenty-day payment terms provided in the agreements. Markey Decl., ¶ 8 and Exhibit B thereto.

23. On at least two occasions, ALT complained to Clean Energy respecting unpaid invoices. Supplemental Declaration of Kevin Markey ("Markey Suppl. Decl.") ¶¶ 4, 6.

24. Clean Energy currently is delinquent on invoices

totaling $180,861.48.  Markey Decl., ¶ 8.  Clean Energy does not deny that the invoices are in arrears and affirmatively states that it deliberately is withholding payment because ALT is not delivering 20,000 gallons of LMG per day.  Powers Decl., ¶ 6.

**C.        Clean Energy's Demand that Full Daily Deliveries be Restored and the City of Phoenix Contract**

25.  By letter dated May 2, 2008, Clean Energy's Senior Vice President, Engineering, Operations and Public Affairs, Mitchell W. Pratt ("Pratt"), wrote to ALT's Vice President of Operations and Interim Chief Executive Officer, Kevin Markey. Pratt acknowledged that there had been "interruptions to our contracted quantities" of LMG and stated that Clean Energy "now must have the full daily deliveries restored."  Pratt Decl., Exhibit B thereto.

26.  ALT responded by letter dated May 20, 2008.  Pratt Decl., Exhibit C thereto.  In the letter, ALT stated that it was experiencing maintenance issues including "water tower replacement, cold box leaks, main compressor seal replacement, gas regeneration compressor replacement as well as other sundry items."  Id.

27.  The timing of Clean Energy's demand to have "full daily deliveries restored" coincides with the "rebidding" of a contract to supply 45,000 gallons of LMG per day to the City of Phoenix.  Declaration of James Harger ("Harger Decl."), ¶ 2.

28.  After ALT secured the contract to supply the City of Phoenix, Clean Energy challenged the award by letter to the City of Phoenix dated June 18, 2008.  Markey Decl., ¶ 11; Harger Decl., Exhibit E thereto.  In the letter, Clean Energy contended

7

that ALT did not have the "demonstrated ability" to deliver LMG in adequate quantity pursuant to the contract. Harger Decl., Exhibit E thereto.

29. Clean Energy's challenge to the awarding of the contract with the City of Phoenix to ALT was partially successful. One third of the contract (15,000 gallons) was taken from ALT and restored to Clean Energy. Harger Decl., ¶ 3; Markey Decl., ¶ 11.

30. Performance under of the contract to supply LMG to the City of Phoenix began on July 7, 2008. Harger Decl., ¶ 2. The very next day, July 8, 2008, Clean Energy commenced this action and filed its motion for mandatory injunctive relief.

**D.     Clean Energy's Alleged Damages**

31. Based on the non-delivery of LMG, Clean Energy claims damages of $2,046,046 over the remaining term of the parties' agreement. Powers Decl., ¶ 7.

32. Of the amount claimed, Clean Energy concedes that nearly 90% ($1,801,800) is ascribed to transportation costs. Powers Decl., ¶ 7.

33. Clean Energy also concedes that ALT is entitled to a setoff because the price of fuel from suppliers other than ALT is likely to be lower than the price charged by ALT. Powers Decl., ¶ 7.

34. Although Clean Energy's Assistant Vice President, Operations, Joseph Brian Powers, presents calculations of Clean Energy's alleged damages as part of his declaration, he fails to provide details or documentary evidence to support his figures. No particulars are offered respecting the source of the

replacement LMG or the actual distances and costs attendant to its transportation. Powers Decl., ¶ 7.

**E.  ALT'S Financial Condition**

35. Clean Energy's conclusions respecting the financial condition of ALT and its ability to pay damages in the event of a judgment against it are based entirely on public filings made with the Securities and Exchange Commission (the "SEC"). Plaintiff's Request for Judicial Notice.

36. The public filings indicate that, as a result of a corporate restructuring completed in July 2008, ALT was acquired by PNG Ventures, Inc. Markey Decl., ¶ 13; Form 8-K of PNG Ventures, Inc. dated June 30, 2008 (Exhibit I to Plaintiff's Supplemental Request for Judicial Notice). In connection with the transaction, ALT did not assume any of the obligations of its former parent, Earth Biofuels, Inc. and is not liable for that company's obligations. Markey Decl., ¶ 13.

37. ALT benefitted by the corporate restructuring in that it enabled ALT to expand its credit facilities. Markey Decl., ¶ 13. According to Clean Energy, the restructuring infused ALT with $2.1 million in cash. Plaintiff's Reply Memorandum, p. 8, ll. 21-23, p. 9, ll. 1-6.

38. Public filings respecting Earth Biofuels, Inc. and PNG Ventures, Inc. were available to Clean Energy when it negotiated and entered into the agreements with ALT for the supply of LMG. Those filings disclosed each company's financial condition and contained "going concern qualifications" of the kind on which Clean Energy now seeks to rely.

39. ALT asserts it is able to meet all of its current

financial obligations as they become due and has not exhausted its available lines of credit. It also asserts that it is the beneficiary of valuable contracts, including the contract to supply the City of Phoenix with LMG, and that it has the ability to compensate Clean Energy for any damages by delivering LMG. Markey Decl., ¶¶ 14-15.

### III.

### CONCLUSIONS OF LAW

1. The purpose of a preliminary injunction is to preserve the relative positions of the parties until a trial on the merits can be held. Virgin Enters., Ltd. v. Virgin Petroleum, Inc., 2000 U.S. Dist. LEXIS 8100 (C.D. Cal. Jan. 19, 2000) (citing Univ. of Texas v. Camenisch, 451 U.S. 390 (1981)); see also Kentz v. Wrigley, 2006 U.S. Dist. LEXIS 82852 (E.D. Cal. Nov. 13, 2006) (same)).

2. "To obtain a preliminary injunction, plaintiffs are required to demonstrate '(1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff[s] if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff[s], and (4) advancement of the public interest (in certain cases).'" Rodde v. Bonta, 357 F.3d 988, 994 (9th Cir. 2004) quoting Johnson v. Cal. State Bd. of Accountancy, 72 F.3d 1427, 1430 (9th Cir. 1995) (citation and internal quotation marks omitted). Alternatively, injunctive relief may be granted where plaintiffs "demonstrate either a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in [their] favor." Id.

(emphasis in original; citations and internal quotation marks omitted).  "These two alternatives represent extremes of a single continuum, rather than two separate tests. . . ."  <u>Clear Channel Outdoor Inc. v. City of Los Angeles</u>, 340 F.3d 810, 813 (9th Cir. 2003) (internal citation and quotation marks omitted).

   3. The party seeking a preliminary injunction has the burden of persuasion by a "clear showing" on each of the factors necessary to obtain the requested relief and also must not have an adequate remedy at law.  See <u>Mazurek v. Armstrong</u>, 520 U.S. 968, 972 (1997) ("It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.") (internal quotations and citation omitted); <u>see also</u> <u>Stanley v. Univ. of So. Cal.</u>, 13 F.3d 1313 (9th Cir. 1994), (citing, <u>Beacon Theatres, Inc. v. Westover</u>, 359 U.S. 500, 506-507 (1959)).

   4. "When a mandatory preliminary injunction is requested, the district court should deny such relief 'unless the facts and law clearly favor the moving party.'" <u>Stanley</u>, 13 F.3d at 1320 (quoting <u>Anderson</u> v. U .S., 612 F.2d 1112, 1114 (9th Cir. 1979)); <u>see also</u> <u>Dahl v. HEM Pharmaceuticals Corp.</u>, 7 F.3d 1399, 1403 (9th Cir. 1993) (noting that mandatory injunctions are "subject to a heightened scrutiny and should not be issued unless the facts and law clearly favor the moving party").  Such heightened scrutiny is reasonable given that unlike a preliminary injunction, a mandatory injunction "changes the position of the parties as opposed to preserving the status quo."  <u>San Diego Minutemen v. California Business Transp. and Housing Agency's</u>

1 Dept. of Transp., 2008 WL 2781138, *22 (S.D. Cal. Jun 27, 2008).

5. "[U]nless the facts and law clearly favor the moving party, a mandatory injunction will be denied." Anderson v. United States, 612 F.2d 1112, 1115 (9th Cir. 1979).

**A.      Likelihood of Success on the Merits**

6. There is substantial evidence tending to show that Clean Energy has breached the contract it now seeks to enforce.

7. Under the law of the State of Texas, which the parties have designated as the law applicable to their agreement, "[i]t is elementary that a party to a contract who is himself in default cannot maintain a suit for its breach." Smith v. Fort, 58 S.W. 2d 1080, 1081 (Tex. App. Amarillo 1933); see also Shuttuck v. Griffin, 44 Tex. 566, 567 (1876). "He must allege performance of the conditions it imposes upon him or a valid legal excuse for his failure to do so." Smith, 58 S.W. 2d at 1081; see also Federal Sign Co. v. Ft. Worth Motors, Inc., 314 S.W. 2d 878, 881 (Tex. App. Fort Worth 1958) ("[w]here one party seeks to enforce performance of a contract or to recover damages for a breach thereof, and the contract contains mutual covenants or requires him to do an act to entitle him to the action, he cannot maintain such action without alleging and proving performance or tender of performance on his part, unless such performance has been excused").

8. In addition to Texas law which requires that a plaintiff not be in breach, in Article XV, Section 15.8 of their agreement, the parties expressly made full performance a condition precedent to the other party's obligation to perform:

15.8 Full Performance Required.

          Performance of any duty imposed on
either party by this Agreement is
conditioned on the other party's full
performance of all duties imposed on it
in this Agreement.

9. Clean Energy admittedly has not fully performed the parties' agreement in that it is withholding payment of at least $180,861.

10. Clean Energy acknowledges a "course of dealings" that deviated from the express terms of the agreement. Under these circumstances, Clean Energy does not demonstrate a likelihood of success on the merits of its claim for breach of contract.

11. Clean Energy also fails to meet its burden as to damages because it has not provided details or documentary evidence so as to permit the Court to verify its calculations. The proof is insufficient. See Pratt Decl., ¶ 10; see also Texas Pipe Line Co. v. Hildreth, 225 S.W. 583, 584 (Tex. App. Dallas 1920). ("The damages recoverable in any case must be susceptible of ascertainment with a reasonable degree of certainty, or, as the rule is sometimes stated, must be certain both in their nature and in respect to the cause from which they proceed. Therefore uncertain, contingent, or speculative damages cannot be recovered . . .").

12. Clean Energy's damage calculation reflects a comparison between the gallons delivered and the 20,000 gallon per day contract amount. Pratt Decl., ¶ 8. It does not account for occasions when ALT had legitimate grounds under the contract

to cancel delivery or for instances when Clean Energy did not schedule pick ups or refused to take delivery.

**B.      Irreparable Harm**

13.   It is well-established that "economic injury alone does not support a finding of irreparable harm, because such injury can be remedied by a damage award." Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc., 944 F.2d 597, 603 (9th Cir.1991) (citing Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League, 634 F.2d 1197, 1201 (9th Cir. 1980)); see also Sampson v. Murray, 415 U.S. 61, 90 (1974) ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended are not enough" to constitute irreparable injury) (quotation omitted)).  However, economic injury may be the basis for injunctive relief "where the plaintiffs can establish that money damages will be an inadequate remedy due to impending insolvency of the defendant or that defendant has engaged in a pattern of secreting or dissipating assets to avoid judgment." In re Estate of Marcos, 25 F.3d 1467, 1480 (9th Cir. 1994).  In such cases, the law provides that injunctive relief is appropriate because of the risk that future remedies at law would become uncollectible and thus inadequate. Id.

14.   Clean Energy concedes that it does not suffer from nor is it seeking relief for a traditional form of irreparable harm.  Instead, Clean Energy bases its assertion of irreparable harm on ALT's alleged financial difficulties and its alleged inability to satisfy any judgment Clean Energy may be awarded. Clean Energy has not met its burden of persuasion.

15.   If Clean Energy were ultimately to succeed on its

claim that ALT has breached the parties' agreement, damages typically provide a sufficient remedy.

16.  Clean Energy does not prove that ALT cannot answer for any judgment that Clean Energy is likely to recover. Although the public filings on which Clean Energy attempts to rely contain warnings to potential investors, they do not establish that ALT cannot pay damages to Clean Energy in the event a breach of the agreement is established.  Moreover, the filings indicate the completion of a corporate reorganization that has improved ALT's financial condition.

**C.      Balance of Hardships and Public Interest**

17.  The hardships do not balance in favor of issuing an injunction against ALT.  The hardship faced by Clean Energy is merely one of damages resulting from the added expense of having to obtain LMG from other sources that may be at a greater distance than the ALT Topock plant.  Clean Energy makes no claim that it cannot obtain replacement LMG from other suppliers and, consequently, there is no risk of Clean Energy being unable to supply its customers.

18.  The 20,000 gallons per day provided for under the parties' agreement is only a small fraction of Clean Energy's business in LMG.  The loss of LMG from ALT (which may only be temporary) will have only a minor impact on Clean Energy's operations.

19.  Diminishing the impact of the loss of 20,000 gallons per day is the new liquefaction plant that Clean Energy anticipates opening this fall.  That facility initially will be capable of producing up to 164,000 gallons of LMG per day, more

than enough to offset the loss of LMG from ALT.

20. In contrast to the facilities of Clean Energy, ALT's operations are more modest. ALT operates a single liquefaction plant from which it attempts to supply its customers. If the Court were to order ALT to supply 20,000 gallons per day to Clean Energy, ALT would not have sufficient LMG to supply its other customers.

21. The parties compete for the same consumers of LMG. To compel ALT to deliver LMG to Clean Energy may have drastic consequences to ALT's business.

22. Unlike the readily quantifiable damages that Clean Energy seeks to recover, the harm to ALT's business from the injunction will not be easily quantified or capable of proof. However, ALT risks irreparable harm by the issuance of the requested injunction.

23. When weighing whether to issue a preliminary injunction, the analysis "creates a continuum: the less certain the district court is of the likelihood of success on the merits, the more plaintiffs must convince the district court that the public interest and balance of hardships tip in their favor." <u>Southwest Voter Registration Educ. Project v. Shelley</u>, 344 F.3d 914, 918 (9th Cir. 2003). Here, Clean Energy has not satisfied the Court that the hardships tip in its favor.

24. For purposes of this motion, the public's interest is in equipoise as to both parties.

**D.    The Clean Hands Defense**

25. Since Clean Energy seeks equitable relief, it is appropriate for the Court to consider equitable defenses

including the defense of lack of clean hands.  <u>Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.</u>, 324 U.S. 806 (1945) (holding that the unclean hands doctrine "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant").  Before Clean Energy receives equitable relief from the Court, it must demonstrate that it is worthy of such relief and that it has conducted its dealings in an equitable manner.  <u>Adler v. Federal Republic of Nig.</u>, 219 F.3d 869, 877 (9th Cir. 2000) (holding that "plaintiffs seeking equitable relief must have 'acted fairly and without fraud or deceit as to the controversy in issue'" (citing <u>Ellenburg v. Brockway, Inc.</u>, 763 F.2d 1091, 1097 (9th Cir. 1985)); <u>see also</u> <u>Precision</u>, 324 U.S. at 814 ("The equitable maxim [is] that 'he who comes into equity must come with clean hands.'").

26. The Court cannot at this time conclude that Clean Energy is worthy of the drastic relief of a mandatory preliminary injunction.  Clean Energy did not adhere to the terms of the agreement and currently owes at least $180,861 in overdue invoices to ALT.

27. Having found no clear and convincing evidence on the grounds stated above of Plaintiff's alleged risk of irreparable harm and having found that the balance of equities does not favor plaintiff, the Court declines to issue a preliminary injunction.

//
//

## IV.

## ORDER DENYING MOTION

Based on the foregoing findings of fact and conclusions of law, the Court denies Plaintiff's Motion for Preliminary Injunction.

The Clerk shall serve this order on counsel for all parties in this action.

IT IS SO ORDERED.

DATED: September 3, 2008.

ALICEMARIE H. STOTLER
_____
ALICEMARIE H. STOTLER
CHIEF U.S. DISTRICT JUDGE